GLEN BURNIE SAVINGS & LOAN ASSOCIATION
*v.* HARRY V. MARTINDALE ET AL.
[No. 57, October Term, 1938.]

*Decided January 10th, 1939.*

The cause was argued before Bond, C. J., Offutt, Parke, Sloan, Mitchell, Shehan, and Johnson, JJ.

*Robert E. Kindred,* for the appellant.

*George B. Woelfel,* for the appellees.

Sloan, J., delivered the opinion of the Court.

James K. Cullen filed a bill of interpleader in the Circuit Court for Anne Arundel County against the Glen Burnie Savings and Loan Association of Anne Arundel County, and Harry V. Martindale, rival claimants of a fund of $375. An order was passed requiring the parties to interplead. The money was paid into court by Mr. Cullen, and a decree finally passed declaring the money to be the property of Martindale, from which the Glen Burnie Savings and Loan Association appeals. While the defendants in the interpleader were required to interplead, neither of them was designated as plaintiff or defendant, according to the usual practice (*Hopkins v. Easton National Bank,* 171 Md. 130, 187 A. 874; *Wetzel v. Collin,* 170 Md. 383, 185 A. 117; *McNally v. Rinn,* 169 Md. 399, 181 A. 675; *Miller's Eq. Proc.* 827, 828), but both answered, neither of them denying that it was a proper case for interpleader, and set up in their answers their respective claims and rights to the fund. *Scott v. Marden,* 153 Md. 14, 137 A. 523.

It appears from the record that on August 13th, 1930, Harry V. Martindale had given a mortgage to the Glen Burnie Savings and Loan Association to secure a loan of $2000, the payments on which had been regularly and promptly made. On or about February 15th, 1933, Martindale applied for an additional loan of $3800, to cover the purchase money of another property, $3500, plus $300 for furniture. The association declined to make the loan, so Martindale borrowed $2000 in New York, for which he received a draft on the Chase National Bank of New York, which was endorsed to the association and deposited by it in its general account in the Glen Burnie

Branch of the County Trust Company, and cleared before the bank holiday of February 25th, 1933. Martindale, in the meantime had applied for a loan on the new property for $1800, and on March 21st, 1933, the purchase of the property was made and the mortgage executed to the association, which paid the purchase money to Carroll F. Conley, who conveyed to Martindale. According to the settlement sheet, the association accounted for $3800, out of which it paid Martindale a balance of $207.74.

At the end of the bank holiday on March 4th, 1933, the County Trust Company did not reopen, but later in the month was reopened and reorganized on a restricted basis. For each $100 the depositors were allowed to withdraw $50, and were given certificates of beneficial interest for $16.67, and a share of stock of $10 par value for the remaining $33.33. This controversy arises because of the claim of the association against Martindale for its loss or shrinkage by reason of the deposit of the New York draft for $2000 in the County Trust Company.

In May, 1936, Martindale executed a mortgage to the First Federal Savings & Loan Association of Brooklyn, conveying to it both properties in Anne Arundel County, on which the Glen Burnie Association held mortgages to secure a loan of $3900, the amount then owing it from Martindale being $1299. The Glen Burnie Association declined to accept this amount, and refused to release its mortgages unless paid $1674, which included its loss on the deposit on account of the New York draft in the reorganization of the County Trust Company. It was later agreed between Martindale and the Glen Burnie Association that Mr. Cullen should retain $375, and that it would release the mortgages held by it, which was done November 14th, 1936. To accomplish this purpose, according to Mr. Cullen's settlement sheet, Martindale himself paid the plaintiff, Cullen, $151.29.

Martindale's chief contention is that the Glen Burnie Association had no right to refuse to release its mortgages when it was tendered its mortgage debts in full, and that it could not require, as a condition precedent, the tacking

of its claim against Martindale on account of the $2000 deposit of his New York draft, and correctly cites *Brown v. Stewart,* 56 Md. 421, 430; *Evans v. Bulman,* 91 Md. 84, 88, 46 A. 315, in support of his contention.

This contention of Martindale's, however, would have been, if raised by him on the bill of interpleader, a case wherein he would not have been required to interplead, as the Glen Burnie Association had no right to condition the release of Martindale's mortgages on the payment of its losses in the County Trust Company. Having waived his right to the release of the deposit made with Mr. Cullen, his position now is his right to the money as opposed to that asserted by the Glen Burnie Association (*Scott v. Marden, supra*), and to determine this question resort must be had to the facts in evidence.

Martindale testified that, after receiving the draft, he went to see James H. Croggan, then acting president of the Glen Burnie Association, who said "* * * he thought it would be possible with that check to lend me the balance of the money * * *" but "* * * he would have to talk to Mr. Kindred (attorney for the building association) about it first." They saw him, the loan was agreed to, subject to inspection of the property, which was made that evening by Messrs. Croggan and Kindred, and Fred W. Kuethe, secretary and treasurer of the Glen Burnie Association, and the loan approved. Asked about what conversation was had in Mr. Kindred's office, when taken there by Croggan, he said, "I do not recall the entire conversation. I do recall that Mr. Croggan said that with that check he thought they could loan me the balance of the money, and Mr. Kindred said he didn't think the association should take the check, and Mr. Croggan said he saw no reason why they should not, and Mr. Kindred said, if you take the check put it in the First National Bank (of Baltimore), and Mr. Croggan asked why, was he afraid of anything happening to the Glen Burnie Bank and Mr. Kindred said No, he would not go so far as to say that, but he thought it would be to their best interest to put it in the First National Bank." When they all re-

turned from the inspection of the property being bought and mortgaged, either Kuethe or Croggan said, "How about the check, or words to that effect. I again told them I would gladly turn the check over to them", and at Kuethe's suggestion he endorsed the check or draft to the Glen Burnie Savings and Loan Association. This was on February 18th, 1933. The draft was deposited in the Glen Burnie Bank, which was in a few days closed, not only with the proceeds of that check deposited in the association's general account, and mingled with its funds, but by subsequent deposits by the association for $1967.61, all of which was there when the bank was closed.

Robert E. Kindred testified that he had advised against the acceptance of the $2000 draft, and that he advised Martindale to deposit it himself in the First National Bank of Baltimore, as he did not consider the Glen Burnie Bank a safe place of deposit. He was not present when the check was turned over to Croggan, who in turn gave it to Kuethe for deposit. He also testified that he would not consent to the release of the mortgages held by his association until Martindale agreed to the retention of $375 to cover his alleged liability, on account of the deposit of the $2000 draft. Martindale said he consented because he was paying interest on three mortgages; in other words, he paid it under duress. Kuethe testified that after he received the draft from Croggan he went to Martindale and told him "* * * we would not clear that check for him. He asked me why, and I told him we had no interest in the check and I saw no reason why we should clear it for him, and he insisted we should clear it for him, and he insisted I give him a good reason why we would not, and I told him very definitely I was not at all sure of the condition of the Glen Burnie bank, and I was not sure just when this mortgage would go through, and I did not want to run any chance of the bank closing up with that $2000.00 in our account. * * * Mr. Martindale insisted we take the check and clear it for him and he said '* * * If you will clear that check I will see to it you don't lose anything as a result of it' ". When Martin-

dale gave the check to Croggan, who seemed anxious to get it, it was Kuethe who told him to endorse it to the Glen Burnie Savings and Loan Association. Martindale testified that he thought they were afraid of the "check", which was a draft for $2000 drawn by one good New York bank on another good New York bank, and that it was a month or more after the transaction was completed that demand was made on him by Kindred and Kuethe to make up the shrinkage of his proportion of the Association's deposit in the Glen Burnie Bank.

The conduct of the officers of the association, after acceptance of the draft, with respect to the Glen Burnie Bank, is not consistent with its suspicions of its safety. When the bank closed, its deposit amountd to $4934.73, of which $1967.61 was deposited after the deposit of Martindale's draft. The mortgage transaction of $1800 and the purchase of the property at $3500 were completed on March 18th, 1933, the checks covering the same having been drawn by the association on the First National Bank of Baltimore, and one of the checks for $207.51 was made to Martindale, being the balance paid to him by the association on the whole $3800 transaction, and gave him full credit for his $2000 draft, and why the association should have made this refund to Martindale, in view of its present claim, is not easy to understand, unless its contention now is an afterthought.

The question then, in this case, is the liability of a principal, Martindale, to his agent, Glen Burnie Association, on a gratuitous undertaking of the latter. In *Baker v. Wainwright*, 36 Md. 336, 347, quoting *Story on Agency*, sec. 339, it is said: "If an agent has, without his own fault, incurred losses or damages in the course of transacting the business of his principal, he will be entitled to full compensation therefore." *Restatement—Agency*, sec. 379; *Williams v. Higgins*, 30 Md. 404, 408.

When the Glen Burnie Association accepted Martindale's draft, there was no stipulation, agreement, or direction as to where it should be cleared or deposited. All Martindale did was to give it a good draft for $2000,

592

which was to be applied to the purchase money of property he was buying, the difference to be loaned on mortgage by the association. It could hold the draft, or deposit it wherever it pleased, and it chose to put it in a bank where its attorney and treasurer both said it might not be secure. They did it, and not Martindale, and now they want to hold him responsible for a loss which they and not he incurred; it was their fault and not his that there was any loss, so that they are in no position to demand reimbursement from their principal.

*Decree affirmed, with costs.*